## MICHELSEN et al. v. PENNEY et al.

District Court, S. D. New York.

Oct. 6, 1941.

606

Kendall A. Sanderson, of Boston, Mass. (I. Gainsburg and Joseph P. Segal, both of New York City, of counsel), for complainants.

Gibboney & Harris, of New York City, and George P. Barse, of Washington, D. C., Gen. Counsel for Comptroller of the Currency (Stuart G. Gibboney, Peyton Randolph Harris, and James L. Duncanson, all of New York City, of counsel), for defendant receiver.

Gwinn & Pell, of New York City (Ralph W. Gwinn, Caleb C. Curtis, Harold H. Corbin, and Henry J. O'Neill, all of New York City, of counsel), for defendant Penney.

KNOX, District Judge.

This case is before me upon exceptions filed to the findings and conclusions of the Special Master herein.

The suit is of major importance. The record consists of more than 8,000 pages of testimony, and this is supplemented by hundreds of exhibits. The Master's opinion and report occupy 331 printed pages. The exceptions thereto are supported by many briefs of excessive length, with the result that they have tended to confuse rather than clarify the exceedingly intricate questions that are here involved. Much as I dislike to increase the length of the record, there seems to be no escape from the necessity of writing a detailed opinion, and so I begin.

Defendant Penney is a highly successful, and nationally known business man. During the halcyon days of real estate speculation in Florida, he became deeply interested in land developments in and about the City of Miami. He became a citizen of Florida, and was there when the heavily charged bomb of actuality fell upon the inflated real estate market of that community, spreading ruin and financial disaster throughout the state. As everyone knows, banks toppled, values shrunk, one knows, banks toppled, values shrunk, building ceased, and the City of Miami, from a business standpoint, was all but prostrate.

Under these circumstances, many Floridians, along with others, lent their aid in clearing away the debris of the financial hurricane, and in salvaging such property and monetary values as remained. Among these, James C. Penney came to play a leading role.

The City National Bank and Trust Company was tottering dangerously, and Penney went to its rescue. In the course of the effort then put forth, the City National Bank in Miami came into existence.

That institution was organized upon December 23, 1927. Its history and background were these:

At the start of business, the bank had a capital of $500,000, and a surplus of like amount. These sums had been supplied by a syndicate composed of three individuals and one corporation. The members, as specified below, subscribed the sums of money set opposite their respective names:

| | |
|---|---|
| J. C. Penney-Gwinn Corporation, | $500,000. |
| W. R. Comfort | 200,000. |
| C. M. Keys | 200,000. |
| Charles L. Briggs | 100,000. |

The City National Bank and Trust Company had been organized in October, 1925, and on the 6th of January, 1926, it was authorized to begin business. In May of that year, its name was changed to the City National Bank and Trust Company of Miami. Its president was Clark B. Davis. The institution had hardly gotten under way when Miami Bank and Trust Company and Commercial Bank and Trust Company failed. Many of the assets, among them a considerable number of uncertain and doubtful quality, were acquired by the new bank. In acquiring these securities and other paper, the City National Bank and Trust Company of Miami received certain guarantees from First National Bank of Miami, and from the Bank of Bay Biscayne. A publicly subscribed fund furnished some further assurance of indemnity. In the end, however, all this was inadequate for the proper protection of the new bank.

Finally, a situation developed that, upon March 19, 1927, the institution was put to the necessity of borrowing $5,000,000. This was accomplished through the medium of a trust agreement wherein First

Trust and Savings Bank was named as trustee. The needed funds were supplied by a number of New York and Florida Banks. The Federal Reserve Bank of Atlanta was likewise a lender. Thereafter, this loan and the collateral securing the same, became known as the "pool loan." Under the trust agreement, the Trustee was vested with powers of wide import. Among them was the right to apply the proceeds of any collection or realization upon collateral towards the reduction of the loan. By the time that the City National Bank in Miami came into being, the amount unpaid upon the pool loan was $3,550,000.

J. C. Penney-Gwinn Corporation, referred to hereafter as Penney-Gwinn, was organized under the laws of Florida. It had been formed to take over certain interests and holdings owned by J. C. Penney and by Ralph W. Gwinn. The latter is a New York lawyer, and a member of the firm of Gwinn & Pell. This firm handled most, if not all, of the legal work of both J. C. Penney and Penney-Gwinn Corporation. It is of counsel to Penney in this litigation. Penney-Gwinn was owned respectively by Penney and Gwinn in the proportion of 10/11th and 1/11th.

Penney-Gwinn and Penney were represented in Florida by a man named Richardson Saunders, and Penney had become interested in Florida banking at the instance of W. R. Comfort who then was a stockholder of the City National Bank and Trust Company of Miami. Penney decided upon the venture after having received a report which he had delegated Gwinn and Saunders to prepare and submit to him. Subsequently, the aforementioned syndicate was formed and began to function.

In the first instance it was contemplated that the syndicate funds would be applied to the reduction of the pool loan. In return therefor, the syndicate, in addition to interest upon its money, was to have certain bonus shares of stock in the City National Bank and Trust Company of Miami, to be contributed by its old stockholders. This plan did not eventuate. Decision was made to found City National Bank in Miami, and the syndicate money was applied to constitute in equal amounts the capital and surplus of the institution.

The stated capital funds of the City National Bank and Trust Company of Miami then stood at $2,000,000. Its surplus was listed at $500,000. Upon February 10, 1928, that bank charged off its assets to the extent of $1,500,000. Thereupon, under an agreement dated January 3, 1928, the two banks were united under the name of City National Bank in Miami. Stockholders in City National Bank & Trust Company exchanged their stock in the new bank upon the basis of four shares for one. By this arrangement, and the contribution of the syndicate, the new bank, which issued 10,000 shares of its capital stock, each of the par value of $100, acquired a capital of $1,000,000, and a surplus of the same sum.

The stockholders of the older bank provided a bonus that was the equivalent of 298 shares of the new organization. This contribution, after the deduction of some legal fees, came into the possession of the syndicate members, Penney-Gwinn's share being 122 shares. That corporation had also purchased the equivalent of 405 shares from the stockholders of the older bank. The shares acquired in the manner stated above, together with other stockholdings of the syndicate members, gave them a majority of the stock of City National Bank in Miami, putting them in complete control of the institution. Penney-Gwinn became, and was recognized as, the dominating factor.

Coincident with the beginning of the new bank, the pool loan agreement was modified. R. N. Denham became trustee in place of First Trust and Savings Bank, and provision was made for a change in interest rates. Proportionately to their respective contributions to the syndicate fund, the participants therein guaranteed the pool loan to the extent of $1,000,000. Thereupon, the entire capital and surplus funds of City National Bank in Miami were applied in reduction of the pool loan. Certain money and other liquid assets of the City National Bank and Trust Company were utilized to extinguish the debts owed to certain banks that had participated in the creation of the pool loan. This, nevertheless, was not so as respects the advances made by Irving Trust Company, Bankers Trust Company and the Federal Reserve Bank of Atlanta. When the new bank began doing business upon February 10, 1928, the pool loan had been reduced to $2,250,000, and by March 1, 1928, further payments had lessened it to $1,750,000. Payments on account thereof continued, and it was wiped out on June 26, 1929, by a final payment of $700,000. The procedure that had been

608

followed was instrumental in requiring the new bank to borrow money frequently in order to continue business. Penney-Gwinn and others were the sources of supply. The motive of Penney-Gwinn in entering the banking field was to make money. This same motive, I have no doubt, also animated Penney. In addition, he may properly be credited, I think, with a desire to stabilize and improve general business conditions in Miami, and thus be helpful to his own Florida investments. At any rate, had the syndicate members not gone to the relief of the City National Bank and Trust Company, that bank would have had to close its doors. A report of a national bank-examiner, as of October 10, 1927, revealed it to be in an unhappy financial state, and this, probably, is what led Comfort and Davis to ask Penney to come to the rescue. Penney saw this report, and when he came into the field, he must have appreciated that the new bank was a sprawling financial infant, unable to stand alone, and completely stripped of the essential raiments of capital and surplus. This is an outstanding reason why, a man in his place, standing before the community as a prince of merchants and a person of great means, should not have lent the bank the use of his name and prestige, unless he was prepared fully to give its affairs his devoted attention and intelligent effort.. At his hands, it received neither. Through the large loans made to the bank by Penney-Gwinn and others, the institution struggled pitifully for about three years and then deserted by Penney, fell by the wayside. During its existence, the bank paid no dividends, and from all that appears, Penney and Penney-Gwinn were wholly without a profit from the bank. From conscious and deliberate fraud, each can properly be acquitted. Nevertheless, the record discloses a story of neglect, poor judgment and erroneous policy that are at once amazing and startling. Upon February 7, 1928, defendant was elected a Director, and Chairman of the Board of the new Bank. The following day he executed and delivered the statutory oath of office which was, that he would "* * * so far as the duty devolves on him, diligently and honestly administer the affairs of such association, and [would] not knowingly violate or willingly permit to be violated any of the provisions of this title, and that he is the owner in good faith, and in his own right, of the number of shares of stock required by this title, subscribed by him, or standing in his name on the books of the association, and that the same is

not hypothecated, or in any way pledged, as security for any loan or debt." U.S.C.A. Title 12, Section 73.

He was reelected to the above mentioned positions in January of both 1929 and 1930. On each occasion he again assumed the obligations of his oath of office.

Recapitalizations.

During the existence of City National Bank in Miami, it underwent two recapitalizations. The first one was this: Assets in the amount of $1,000,000 were written off on February 20, 1929. This resulted in the reduction of the bank's capital and surplus to $500,000 each. Par value of the bank's 10,000 shares of stock was reduced from $100 to $25 each, the stockholders receiving two shares for each share previously held. The syndicate members then underwrote a new issue of 20,000 shares, and these were offered to stockholders at $50 per unit. In this fashion, funds of $1,000,000 were raised to make good the written-off assets. The bank's capital and surplus were thus restored to $1,000,000 each. In bringing about this recapitalization, Penney-Gwinn acquired additional stock to the extent of $492,662.50.

Notwithstanding the infusion of new money, the bank failed to prosper, and a national bank examiner's report of December 6, 1929, showed an estimated loss of $1,020,651.82. Of the remaining assets, $1,422,241.91 were rated as doubtful and $3,611,281.92 as slow. Thereupon the Comptroller of the Currency, in order to protect the situation, demanded that the loss estimated by the examiner be written off, and expressed his intention of levying an assessment of 100% against the bank's stockholders. This, of course, was not pleasing to the bank directorate. An alternative plan of raising money was suggested and adopted. It was this.

On April 4, 1930, assets having a face value of $2,000,000 were stricken from the balance sheet, reducing capital and surplus funds to $500,000 each. This was done through the surrender by each stockholder of one-half of his holdings. About coincident with these changes, and at the instance of the bank's directorate, the Tarrier Company of Delaware was organized. It had authority to issue preferred stock in the amount of $1,000,000 par value, and 100 shares of no par common stock. The preferred stock, carrying voting control, was purchased by the bank's leading stockholders, at a cost of $1,000,000. Follow-

ing this, the bank, in return for a million dollars in cash, and its acquisition of Tarrier Company's common stock, delivered to Tarrier such bank assets as had theretofore been charged off, or which were regarded as doubtful. The face value of these assets exceeded $6,300,000.

As can readily be imagined, when these expedients were first proposed, they were matters of concern to the bank's shareholders. Many of them inquired the reason for doing what was suggested. In order to explain matters, Gordon, president of the bank, prepared and sent a mimeographed letter to each stockholder. He stated that the assets considered most worthless were to be the subject of transfer. In a personal interview, he characterized them as "bad, worthless paper" or "the worst assets we had." At a special meeting of stockholders, called to approve the proposal, Gordon submitted a report to the assembled group. It was there said that "questionable assets" would be charged off, and sold to the Tarrier Company. After hearing the report, the stockholders adopted resolutions whereby the whole plan might fully be executed.

The day following, a letter, over the signature of defendant, was published in the Miami newspaper, in which he said that $2,000,000 of bad and questionable assets had been charged off the balance sheet.

Thereafter, it appears, some of the items transferred to the Tarrier Company consisted of certain cashier's checks, and the guaranty of a solvent bank. Upon such items, the Tarrier Company realized $110,783.14.

The bona fides and honesty of the Tarrier transaction, along with a number of others, are here under violent attack, and further on, more will be said about them. Throughout the greater part of 1930, the bank remained open and carried on business. However, on December 20, of that year, the doors were closed, never to re-open.

The Comptroller of the Currency, on December 23, 1930, announced its insolvency and appointed H. J. Spurway as Receiver. On April 10, 1934, Spurway resigned, and was succeeded by C. H. Bancroft. He died, and R. C. Parsons was substituted.

At the time of closing, some 5,700 depositors were owed $5,996,970.02. They have had a return of forty percent by way of liquidating dividends, and irrespective of the outcome of this suit, will have some further return.

At this point, a moment's consideration should be given to the character of the management and supervision of the bank's activities, upon the part of its officers and directors.

As the name Penney-Gwinn suggests, it is within the control of Messrs. Penney and Gwinn. It was utilized in handling real estate transactions, in which these men were interested. For the purposes of the business, Penney contributed assets of $11,000,000 to the corporation, and Gwinn $1,227,000. One Florida land development handled by the corporation comprised 120,000 acres and another 27,000. The company had also loaned $900,000 to a land venture known as Miami Shores, located on the waters of Biscayne Bay. In order to keep in touch with the business having to do with this development, Penney and Gwinn, as previously indicated, selected Richardson E. Saunders as their representative. Saunders was also associated with the Farm and Town Realty Corporation, wholly owned by J. C. Penney-Gwinn Corporation, and one or more of its other enterprises. After the organization of City National Bank in Miami, Saunders became one of its directors and Vice Chairman of the Board.

In order that Saunders and Lewis, together with certain other persons, might appear to be qualified to act as directors, Penney-Gwinn Corporation transferred qualifying shares into their names, and in return, such persons, with one or two possible exceptions, gave to the corporation a non-interest bearing note which bore a statement as follows:

"The maker reserves the right to deliver in payment of the note the equivalent number of shares of City National Bank in Miami at its then par value."

Following failure of the bank, Penney-Gwinn paid the assessments levied by the Comptroller upon the holdings of nine directors. This, together with the other facts recited, is persuasive evidence that none of these directors held stock of the bank in his own right.

Although living and practising law in New York, Gwinn kept in close touch with the affairs of the bank. When it needed cash, as frequently was the case, Penney-Gwinn activated by Gwinn, supplied the funds.

Of the J. C. Penney-Gwinn Corporation, Penney was President, and Gwinn First Vice President. The latter had his office in the Company's office building in New York. He appears to have passed upon all matters having to do with the advances of money to Penney-Gwinn's various enterprises. He also took part in the selection of the bank's personnel, and exercised considerable general supervision over loans and the activities of the companies in which he and Penney were interested.

Another vice president and director of Penney-Gwinn was Burdette G. Lewis. He spent the greater part of his time in Florida looking after the affairs of Foremost Dairies, another Penney-Gwinn business.

In order to make certain, I assume, that self-interest of bank directors, and their unwillingness to jeopardize their own investments, would tend to make them alert and attentive to their duties, and thus enhance the safety of depositors, Congress has declared that (U.S.C.A. Title 12, Section 73):

"Each director, when appointed or elected, shall take an oath * * * that he is the owner in good faith, and in his own right, of the number of shares of stock required by this title, subscribed by him, or standing in his name on the books of the association, and that the same is not hypothecated, or in any way pledged, as security for any loan or debt."

Section 72 of Title 12 of the U.S.C.A. provides that "Every director must own in his own right shares of the capital stock of the association of which he is a director the aggregate par value of which shall not be less than $1,000. * * * Any director who ceases to be the owner of the required number of shares of the stock, or who becomes in any other manner disqualified, shall thereby vacate his place."

If my assumption as to the purpose behind these laws is correct, a half eye can see that Penney and some of his associates did all they could to frustrate the will of the national legislature.

In the absence of the restraint of self-interest and personal well being, it is extremely easy for persons who are entrusted with the custody and investment of other people's money to be free and easy in making choice of securities into which it is to go. Whatever may have been the honesty of intention of the directors of this ill-fated bank, their slogan seems to have been "Miami real estate values must be preserved and we shall do it." At any rate, they gave approval to numerous loans which, if they were not corrupt, approached the point of asininity. Considering the manner in which some of the directors deliberately, and again and again, flouted statutes designed for the protection of national bank deposits, it would not be difficult, upon slightly more evidence than is here, to draw an inference of downright dishonesty. I am glad to say that the testimony hardly justifies that finding, and it will not be made.

■ At the same time, Penney's actions and those of his legally unqualified dummy directors must be condemned as having breached numerous provisions of the National Bank Act. Each and every act in which any one of them participated, and in which loss resulted to the bank, in my opinion, should be held to have been vitiated by their unlawful conduct. As was said in Kavanaugh v. Gould, 147 App.Div. 281, 131 N.Y.S. 1059, 1064, a case cited by defendant:

"* * * The law has no place for dummy directors. They are bound generally to use every effort that a prudent business man would use in supervising his own affairs, with the right, however, ordinarily to rely upon the vigilance of the executive committee to ascertain and report any irregularity or improvident acts in its management."

One or more of Penney's dummies were upon the Executive Committee, and it failed signally to discharge its duties. The ideas that have just been stated, with respect to the liabilities that attach themselves to the wrongful actions of unqualified persons who assume to act as directors of national banking associations, were first expressed in an oral opinion herein, which was delivered upon February 5, 1941.

In the course thereof, counsel were authorized to submit findings of fact and conclusions of law along the lines of such decision. On April 18, 1941, the prevailing parties served Penney's counsel with a copy of their proposed findings and conclusions, and with notice of settlement thereof, returnable April 28, 1941. The attorneys for Penney were given until May 23, 1941, to serve and file criticisms of and objections to the proposals of the other side.

Without obtaining leave of Court, counsel for Penney, on May 19, 1941, served and filed a "Memorandum on Behalf of James C. Penney, in Respect of Liability

Arising out of Alleged Defective Qualification of Certain Directors."

This "memorandum" is attacked as an "unauthorized re-argument of the case upon the merits." Ordinarily, this objection would be well taken. But, for reasons that presently will appear, my view of the law, as set forth in the oral opinion of February 5, will be somewhat amplified. Consideration will also be given to the merits of some other points raised by defendant.

█ The duties and liabilities of directors of national banks are of two kinds (1) those imposed by the National Bank Act, the charter and by-laws of the bank; and (2) common-law responsibilities, arising concurrently from the fiduciary relationship of the directors to the bank's stockholders, depositors and creditors. Gallin v. National City Bank, 152 Misc. 679, 273 N.Y.S. 87, O'Connor, The Law of National Banking 1941, paragraph 4505.

█ Directors of a national banking association are not relieved from their common-law duty to be honest and diligent by anything contained in the National Bank Act. As the Supreme Court has pointed out, this is shown by the oath in which such directors swear that they will "diligently and honestly administer the affairs of the association" and will not "knowingly violate or willingly permit the violation of any of the provisions" of the statute. Bowerman v. Hamner, 250 U.S. 504, 39 S.Ct. 549, 550, 63 L.Ed. 1113. Similarly, the National Bank Act in no wise impairs the common-law liability of directors in the event that they fail diligently and honestly to discharge their trusts. Bowerman v. Hamner, supra; O'Connor, op.cit., paragraph 4510.

The opinion of February 5 clearly states defendant's responsibility under both of these sources of liability. It also called attention to a "much broader basis" for decision, viz., violation of Section 72 of the National Bank Act, which prescribes the qualifications of directors of national banking associations.

It is this "broader basis" of my decision that defendant now assails as a "novel theory of law." On this branch of the case, the gist of the argument, as stated upon Penney's behalf, is this:

"Assuming, for argument's sake, that these persons were unqualified, no civil liability attached to the unqualified directors merely because of some defect in their qualification. The only civil liability is that imposed by Section 93 of the banking act, and since no damage was sustained in consequence of the mere defective qualification, no liability was imposed by that section. In any event, the unqualified persons were de facto directors, and, as such, subject to the same liabilities as de jure directors and no more. * * * The requirement that directors of a national bank shall own, in their own right, $1,000 in par value of its stock is entirely statutory. There is no requirement at common law that a director be a 'stockholder'. * * * Section 93 * * * imposes liability only 'for all damages which * * * shall have been sustained in consequence of such violation' * * *. None of the losses were 'sustained in consequence of such violation' * * *. There is no common law tort toward the bank arising out of the mere fact of a defect in qualification. * * * The requirement that directors should have stock of the par value of $1,000 is largely an anachronism. It dates back to a time when banks were small. * * * Looking at the realities, the requirement of such an investment was purely technical. * * * Section 72 of the Banking Law merely requires that 'any director who ceases to be an owner of the required number of shares * * * shall thereby vacate his place.' This Section does not impose any liabilities for continuing to act notwithstanding cessation of qualification. All that the Banking Law imposes by way of civil liability for breach of this and other statutory requirements is set forth in Section 93. * * * It is, of course, clear that * * * the persons in question could not properly take the oath required by Section 73 of the Banking Act * * * because the section as to an oath required them to swear that their stock was not hypothecated, or in any way pledged, as security for any loan or debt. When the person in question took the oath, in view of the circumstance that their stock was pledged as collateral for the purchase money loan, they made a false oath. As such they might be subject to the criminal liabilities attaching to a false oath and they were also subject to the civil liabilities imposed by Section 93 of the Banking Act for losses that were sustained 'in consequence' of the falsity of the oath, if there were any losses of that kind. But in the meantime they were fully qualified directors."

█ In this connection, it must be recalled that the last sentence of Section 72 of the National Bank Act reads:

"Any director who ceases to be the owner of the required number of shares of the stock, or who becomes in any other manner disqualified, *shall thereby vacate* his place."

Defendant's argument, in substance, is that the statute is of the type known to the Roman law as a "lex imperfecta," in that it neither declares the act in violation of the statute to be invalid nor provides that a penalty follows. Ulpianus, Regularum liber singularis, Pr. 1, 2. There would be more weight to the argument if the statute merely said that a director "shall vacate" his office. Had this phraseology been used, it might possibly be interpreted as constituting a command that the unqualified director should forthwith cease to act as a director, and that his previous acts, done in good faith and with reasonable judgment, would not be open to attack. But, in this respect, the statute is not so lame as defendant would have me think. The law, by mandatory words, specifically declares that upon the disqualification of any director, he "shall *thereby* vacate his place." And this, I assume, means "instanter." The effect of the word "thereby" is to work an automatic and *complete forfeiture* of authority to do anything upon behalf of the bank. In and of itself, the statute, in essence, has declared that an unqualified director is nothing more nor less than an interloper. Little, if any, room is left for a discussion of the authority of "de facto" "directors."

All that remains for consideration is the claimed validity of the rights and privileges of interlopers, intermeddlers and usurpers. There was no talk of "de facto" "executors" in Glascock v. Gray, 1908, 148 N.C. 346, 62 S.E. 433, 434. In that case a statute of North Carolina provided that "No foreign executor has any authority to intermeddle with the estate until he shall have been entered into bond" (Revisal N.C.1905, § 28), within a year from the testator's death. The ruling was that deeds made by foreign executors, who had never qualified in North Carolina, to lands in that State, under a testamentary power to sell, conveyed no title until the statutory requirements had been complied with. The Court cited Scott v. Blades Lumber Co., 1907, 144 N.C. 44, 45, 56 S.E. 548, where it was said that "a deed to real property made by foreign executors by virtue of authority in the will is *void* in this state unless the executors qualify here."

Furthermore, the distinction between "an officer de facto" and "a mere usurper" is not unfamiliar to the common law. Matter of Ringler & Co., 1912, 204 N.Y. 30, 97 N.E. 593, 598, Ann.Cas.1913C, 1036 and cases therein cited; 2 Fletcher Corp., 69 (1931).

From the argument made upon behalf of Penney, it appears that he is now driven to Section 93 of the Bank Act in an attempt to avoid, or minimize, his civil liability. To this end, he is willing, apparently, to charge certain of his chosen "directors" with having criminally made false oaths in violation of Section 73. To the same end, he is also prepared to belittle the Congressional policy having to do with the qualifications to be possessed by directors of national banks. He concedes "there are statutes in substantially every state making stock ownership a condition precedent to qualification for a directorship in state banks, or business corporations."

As respects national banks, he must also admit that the matter is minutely regulated by Congressional enactment.

Section 72 of the National Bank Act, as previously pointed out, provides that "Every director must own in his own right shares of the capital stock of the association of which he is a director the aggregate par value of which shall not be less than $1,000, unless the capital of the bank shall not exceed $25,000 in which case he must own in his own right shares of such capital stock the aggregate par value of which shall not be less than $500."

See, also, Public Utility Act of 1935 (Federal Power Act), Title II, Part III, Section 305, 49 Stat. 856, Title 16 U.S.C.A. § 825d; Public Utility Holding Company Act of 1935, Title I, Section 17(c), 49 Stat. 831, Title 15 U.S.C.A. § 79q (c). As for the personal liability of directors of member banks, see Title 12 U.S.C.A. § 503, Federal Reserve Act, Section 22(f). Section 71a of the National Bank Act, specifying the qualifications of the board of directors or other similar governing body of every national banking association and of every State bank or trust company which is a member of the Federal Reserve System, was not enacted until 1933.

This section at that time required that "every director, trustee, or other member of such governing body shall be the bona fide owner in his own right of shares of stock of such banking association, State

bank or trust company having a par value in the aggregate of not less than $2,500, unless the capital of the bank shall not exceed $50,000, in which case he must own in his own right shares having a par value in the aggregate of not less than $1,500, or unless the capital of the bank shall not exceed $25,000, in which case he must own in his own right shares having a par value in the aggregate of not less than $1,000."

So much of this section as related to stock ownership by directors, trustees or members of similar governing bodies of member banks of the Federal Reserve System was repealed by Act of June 16, 1934, C. 546, Section 4, 48 Stat. 971, 12 U.S.C.A. § 71a. So much of the section as related to stock ownership by directors, trustees, or members of similar governing bodies of any national banking association or of any State bank or trust company which was a member of the Federal Reserve System, was repealed by Act of August 23, 1935, Chapter 614, Section 306, 49 Stat. 708.

From all of the foregoing, it is certain that Congress has given close attention to the question of the stock holdings of bank directors.

Defendant, taking an atomistic view both of the affairs of the bank and of the interpretation of the statute, insists that, under Section 93, there was no damage proximately resulting from the mere defective qualification per se of his dummies, and that, therefore, neither they nor himself is under civil liability to the depositors.

The opinion of February 5 stresses that Section 72, in effect, obviates the impractical, if not impossible task of allocating liability, and of apportioning damages, according to a standard of causation, allegedly required by a literal application of the narrow and restricted last phrase of Section 93. The structure of Section 72 implies all that it fails to specify. It states particularly the several requisites of eligibility to serve as a director of a national bank. These are that, every director must (1) during his whole term of service, be a citizen of the United States, and (2) at least three-fourths of the directors must have resided in the State, Territory or District in which the association is located, or (3) within fifty miles of the location of the office of the association, for at least one year immediately preceding their election, and (4) must be residents of such State or within a fifty-mile territory of the location of the association during their continuance in office. (5) Every director must own in his own right shares of the capital stock of the association of which he is a director of a certain prescribed par value. In this connection, it is important to note that the section makes no attempt, if such an attempt were thought at all feasible, to isolate the liabilities, or to calculate the damages proximately resulting from violations of one or more of the qualifications prescribed by the statute. The law will be satisfied with a much less sophisticated, and much more practical criterion of responsibility. The final sentence of the section broadly lays down the principle that for ceasing to be the owner of the required number of shares or for becoming *"in any other manner disqualified,"* every director "shall thereby vacate his place."

The simple and inescapable fact is that, under the statute, the depositors had a *right* to have qualified directors in office. From this premise, it follows, according to elementary principles of the law of torts, that "where an act is, either inherently or because of the manner of performance, an unprivileged invasion of right, the absence of malice or the presence of a good motive does not render it any the less a tort; if the conduct is outside the zone of privilege, it is tortious regardless of motive." 62 C.J. 1106.

All this leads me to adhere to my previous declaration, that such sums as the unqualified "directors" lost, wasted and dissipated, are items for which recovery can here be had. Penney, as previously found, was party and privy to the wrongs committed by the "directors" and he must respond personally for such losses as came to the depositors through the unwarranted and unlawful acts of his chosen dummies. They acted, not only at their peril, but also at that of Penney. It was he, through Penney-Gwinn, who brought them into being.

Penney, with certain exceptions noted in my findings of fact, is also liable for losses where there was a violation of the National Bank Act. Each of such violations as to which he is held to responsibility inflicted "damages * * * sustained in consequence of * * * violation" of the statute.

To hold otherwise would subvert the purpose not only of the National Bank

Act, which itself must be read as a whole, but also of other statutes in pari materia.

"The liability of a director of a national bank is for the most part fixed by federal legislation." 25 Georgetown Law Journal, 146 (1936).

Attorney General (now Justice) Jackson recently called attention to the addition to the banking law of such statutes as the Reconstruction Finance Act, 15 U.S.C. A. § 601 et seq., the Federal Deposit Insurance Act, 12 U.S.C.A. § 264, "in addition to many recent amendments of the basic National Bank Act and the Federal Reserve Act." Foreword to O'Connor, op. cit.

The applicable Federal statutes are collected in Mr. O'Connor's learned treatise, and there is no need to review them here in extenso. They clearly indicate the continuous Congressional judgment that certain legislative and administrative regulations are necessary in this field, as in so many others, adequately to safeguard the public interest.

If the arguments made by Penney be sound, it would appear that Congress has shown an amazing solicitude for the wrongful and deliberate acts of persons who, being in control of other people's money, have wasted that substance, as it were, in riotous living. Amazing, too, if defendant is correct, would be the fine disregard which Congress has shown for the just rights of outraged depositors.

Defendant's interpretation of the law is not in accord with recent judicial pronouncements. In United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788, decided by the Supreme Court on February 3, 1941, the ruling was that certain conduct was protected from criminal prosecution under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, because of exemptions of the Clayton Act, 15 U.S.C.A. §§ 12–27, as re-defined in the Norris-La-Guardia Act, 29 U.S.C.A. § 101 et seq. The Court, per Frankfurter, J., said at page 235 of 312 U.S., at page 467 of 61 S.Ct.:

"Such legislation must not be read in a spirit of mutilating narrowness. On matters far less vital and far less interrelated we have had occasion to point out the importance of giving 'hospitable scope' to Congressional purpose even when meticulous words are lacking. Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 391, 59 S.Ct. 516, 519, 83 L.Ed. 784, and authorities there cited. The

appropriate way to read legislation in a situation like the one before us, was indicated by Mr. Justice Holmes on circuit: '* * * The Legislature has the power to decide what the policy of the law shall be, and if it has intimated its will, however indirectly, that will should be recognized and obeyed. * * * It is not an adequate discharge of duty for courts to say: We see what you are driving at, but you have not said it, and therefore we shall go on as before.' Johnson v. United States, 1 Cir., 163 F. 30, 32, 18 L.R.A., N.S., 1194."

In Van Beeck v. Sabine Towing Company, 1937, 300 U.S. 342, at page 351, 57 S.Ct. 452, at page 456, 81 L.Ed. 685, the Supreme Court, in a unanimous opinion, per Cardozo, J., wrote: "There are times when uncertain words are to be wrought into consistency and unity with a legislative policy which is itself a source of law, a new generative impulse transmitted to the legal system."

Defendant places much reliance upon the English case of In re Canadian Land Reclaiming and Colonizing Company, 1880, 14 Ch.Div. 660. In this case C. and D. were appointed, and for some time acted, as directors of a land company, the articles of which made the holding of 100 shares the qualification for a director. Neither of them held any shares. No allegation was made that either C. or D. had done or concurred in any act which would have made him liable for misfeasance if he had been a duly qualified director. The company was in course of being wound up. The liquidator applied under Section 165 of the Companies Act of 1862 to charge them for "misfeasance" in acting as directors without qualification. The application of this section was the only question in the case. The ruling of the Court of Appeal, reversing Jessel, M. R., was that the section created no new right, but merely provided a new summary remedy for calling directors to account for acts of impropriety for which there would be at all events relief without the new procedure in the Courts of Law. In the argument before the Court of Appeal, counsel for the successful appellants C. and D., made two points, which, in my opinion, peculiarly support the view I have taken of defendant Penney's liability. These were as follows: (1) "We do not dispute that if these gentlemen had wasted the moneys of the company, they would have been liable under this section." (2)

"The misfeasance of appointing these gentlemen directors without qualification was the act of the other directors, and the proceedings ought rather to be against them." 14 Ch.Div. at 668, 669.

It will thus be observed that Mr. Machen, in the sentence quoted by defendant from the author's treatise on Corporations (1908), Volume 2, Section 1413, is merely generalizing the *result* reached in the above entitled English decision. In support of his generalization, the learned author cites this one case, and no other. His statement is "Where a person improperly acts as director without the required qualification, his conduct cannot be commended; but he does no actionable wrong to the company, for no damage can be proved to have been sustained by the corporation."

The author doubtless derived this conclusion from the fact that in the Canadian Land case, no act of misfeasance was alleged against either C. or D. for which either would have been liable had they been duly qualified directors.

Doehler v. Lansdon, 1931, 135 Or. 687, 291 P. 392, 298 P. 200, merely illustrates the familiar doctrine that third persons contracting with a corporation are held not obligated to inquire whether its directors failed to take the required oath.

Matter of Ringler & Company, 1912, 204 N.Y. 30, 97 N.E. 593, Ann.Cas.1913C, 1036, is cited in complainant's reply to defendant's memorandum. From the head-note in the State report of that case, the following may be quoted:

"Where the by-laws of a corporation require a director to be 'the holder or owner of at least one share' of its stock and it appears that stock has been transferred prior to an election for the sole purpose of qualifying the transferees as directors, but that these shares had been immediately assigned back to the true owner in blank, their election to the office of director is invalid. * * * *The persons so elected were between themselves and the corporation never directors or trustees either in fact or in law. They became officers de facto only as to the public and third persons dealing with the corporation,* and when they elected other directors to fill vacancies the persons so elected acquired no more right or title to the office than those who assumed without power or authority to elect them."

It will thus be seen that the Court of Appeals of the State of New York regarded a by-law of a corporation as a matter of significant importance, notwithstanding that such by-law was capable of amendment or rescission at any time.

■ In this connection, complainants propound the following question to their adversary: "Shall less weight be given by the Federal Courts to the requirements which the Congress of the United States has prescribed as the qualifications of a director of a National Banking Association?"

To this query, the answer, of course, is "No." To this I may add that, in my judgment, this court is in duty bound to carry out the obvious intent and purpose of Congress that, in handling the money of national bank depositors, the unwarranted action of disqualified officials can neither be tolerated, condoned nor excused. If such directors lose or dissipate the funds which they have handled, they must respond to those whose money has been unlawfully handled, and lost. And, liability, as I have said, rests also upon the persons who connived, aided and abetted the unqualified directors by making it possible for them to engage in the unauthorized use of the money of the bank's depositors.

On reconsideration of the whole case, I am satisfied that what I have already said (on the subjects of "causal relation" and "statutory interpretation") makes plain why, on the particular facts involved in Reserve Deficiency Losses Nos. 6 and 7 herein, I do not consider myself bound by Holman v. Cross, 6 Cir., 1935, 75 F.2d 909, or by Allen v. Luke, C.C.D.Mass.1908, 163 F. 1018, to the extent that they point to a contrary conclusion.

Returning now to factual discussion, it may be said that throughout the life of the bank, Gwinn took part in the selection of directors, and it was at his suggestion and perhaps insistence, that Penney accepted the chairmanship of the Board. It was Gwinn, too, who helped bring about the promotion of Saunders to the vice presidency of the Board, at a salary of $7,500. At Gwinn's direction, Saunders chose attorneys, from time to time, to represent the bank. Reports upon the bank's condition, its profits, losses and commitments, went regularly to Gwinn. Other details of management were under his supervision and direction.

As a result, he was at all times in a position to keep Penney advised of what was going on, and there can be little or no doubt

that he did transmit much of his knowledge to him.

During the time the bank was in operation, the directors held twenty-six regular and special meetings, of these, Penney attended three, two in 1928, and one in 1930. He was present, too, at a meeting of the Loan and Discount Committee !in 1930, when the advisability of extending aid to the Coral Gables Corporation was under discussion. In connection with the inattention of the Chairman of the Board to the affairs of the Bank, the Special Master's report states the following:

"Defendant Penney offers excuses for nonattendance at meetings which will not go. His wife suffered injury in a fall from a horse in Westchester the latter part of September, 1928 (presumably after the meeting of September 11th) which kept her in the hospital two weeks. Mrs. Penney was up and about before the meeting of October 26, 1928, however, and defendant Penney was off on his fall round of livestock fairs and store visits, having left White Plains for Memphis, Tennessee, on October 14th.

"His own run down condition and Mrs. Penney's health resulted in a trip around the world, leaving the middle of January, 1929, and returning a few days before May 28, 1929. A fainting spell two or three days after return resulted in a quiet summer at Kent, England, from which he did not return until September 27, 1929. It would, no doubt, be reasonable to excuse for such trips abroad a director who had been faithful in attendance at other times. Before the first of these trips in 1925 was taken, however, it must have been clear to defendant Penney that he should resign and insist that a substitute be selected who could be present and share the responsibility devolving on the board.

"He suffered sinus trouble which did not prevent at least three long sea voyages during the period. He had tonsilitis and colds. No doubt some of the absences could properly be excused. In view of the fact, however, that defendant Penney's infirmities did not prevent long trips to attend to business of the J. C. Penney Company and frequent attendance at the livestock fairs throughout the country in pursuance of his interest in breeding Guernsey cattle, the conclusion is inescapable that defendant Penney treated the bank's business as of secondary consequence.

"As a director he was thoroughly incompetent. His ignorance of the procedure of banks in general and of this bank in particular was abysmal, nor had he profited from his previous experience as a director of a bank in Salt Lake City. He had made no effort to prepare himself for the job. He was unfamiliar with the National Banking Act. He did not know how many vice presidents the Bank had, how it was organized by departments, whether it dealt in foreign exchange, who represented the bank in the management of the Clearing House Association, whether there was a regular independent audit of the bank's books, what employees of the bank were bonded, what precautions there were against burglary and holdups, how many tellers the bank had or what were their functions, what forms of insurance the bank carried, whether the vault had a time-lock, or whether there was a separate savings or thrift department. He had forgotten, if he ever knew of, the City Trust Company, the bank's trust affiliate, and had confused it with the Guardian Trust Company, organized to take over certain trusts in the Bank of Bay Biscayne. He did not know the difference in functions between a comptroller and a cashier. He did not know who had charge of the investment of surplus funds. He did not know what changes would be involved in setting up the women's department that he advocated.

"Defendant Penney may have considered that he was entitled to be relieved of the irksomeness of learning anything about this bank and the boredom of attending its meetings by reason of the financial contributions of Penney-Gwinn. These had been substantial. They included an original investment of $500,000; a contribution of $493,662.50 when the bank was recapitalized on February 20, 1929; a further contribution of $403,981.25 when Tarrier Company of Delaware was organized, and the assumption and payment of Tarrier's note of $436,936.25."

After pointing out that, between March 1, 1928, and November 2, 1930, Penney-Gwinn loaned the bank various sums of money amounting to $2,334,498.50, and that at the time of failure it had on deposit the sum of $485,500.87, the Master goes on to say:

"In addition, Penney-Gwinn guaranteed a $350,000 certificate of deposit made by Irving Trust Company of June 4, 1929,

which was later taken over by the Chemical Bank and remained unpaid when the bank failed. Penney-Gwinn guaranteed the payment of the pool loan (that had been made to relieve the distress of City National Bank & Trust Company of Miami) to the extent of $500,000. Again in June 1929 in order to enable the bank to substitute surety bonds for the government securities which it had pledged to secure public deposits, Penney-Gwinn gave its collateral guarantee to National Surety Company in the amount of $400,000, and later in the amount of $200,000.

"A friend who could make such contributions and procure such results was, no doubt, of more value to the bank than one who merely contributed his judgment at directors' meetings, particularly when that judgment was as uninformed as defendant Penney's appears to have been. Nevertheless, the law requires that the board of directors exercise the corporate powers of the bank and give its affairs direction. When a director is called to account by the receiver or the depositors on behalf of the bank the Master has no choice but to pronounce negligent the unexcused failure to give attention to the bank's business and to participate in its management."

By way of emphasis to the conclusion of the Master, I wish to add that, in my opinion, Penney's conduct, so far described, was negligence of the grossest kind. Later on his wrongs to the depositors were magnified.

On April 1, 1930—about six weeks before the Bank of Biscayne failed, and just after the City National Bank in Miami had its transaction with Tarrier Corporation—the following statement, over Penney's signature, appeared in the newspapers of Miami:

"April 1, 1930.

"To the Citizens of Miami:

"In the early part of 1928, several of my associates and I acquired the majority of the stock of the City National Bank in Miami, believing that in so doing a great service could be rendered to the community. Our purpose was to help stabilize the banking situation in Miami.

"About two years prior to 1928, the Bank had absorbed two local institutions—Miami Bank & Trust Company and Commercial Bank & Trust Company—and as a result it sustained losses which were made more severe because of the hurricane and the collapse of real estate values in Miami.

"It became necessary therefore to make good these losses and accordingly in 1928 and shortly thereafter we put into the Bank Two Million Dollars of new money and removed from its assets a like amount of bad paper. While this action on our part went a long way toward remedying the situation, we have found now after a searching examination and evaluation of the Bank's receivables that it is advisable to still further rid it of questionable assets.

"To carry into effect our decision to keep the Bank in a thoroughly sound condition, we have as of date of March 31, 1930, put into the Bank another One Million Dollars of new money and have at the same time reduced our capital funds by One Million Dollars, thereby charging off Two Million Dollars of bad and questionable assets.

"So we now advise the public of the steps that we have taken, feeling that they will appreciate this frank statement of facts.

"As has been shown we have in the past three years sustained heavy losses but we have made good these losses and put the Bank in a strong and enviable position.

"Our capital and surplus of One Million Dollars gives adequate funds with which to operate a bank with many times the total deposits that we now have.

"It is our purpose to conduct the City National Bank of Miami along conservative lines. We have ample funds with which to meet the legitimate demands of business, and we stand ready to accord credits to any of our customers whose business is in such condition to warrant assistance.

"I have the utmost confidence in the future of Miami and the whole of Southern Florida, and my associates and I have evidenced this faith by our investments in Miami. We have been squarely behind the City National Bank in Miami since we entered it three years ago. We have backed the Bank and Miami unreservedly in the past, and we shall continue to do so in the future. The City National Bank in Miami solicits the business of the people of this section.

"I want to take this opportunity to thank our depositors for their patronage and to

express the hope that they will join us in building a greater Miami.

"(Signed) J. C. Penney

"Chairman of the Board of Directors of City National Bank in Miami."

When the Bank of Bay Biscayne went to the wall, the following statement, with the acquiescence of Penney, was published:

"1930 JUN 11 PM 12 56

"Hugh H. Gordon Jr, President—

"City National Bank in Miami Miami Flo—

"I have just learned with regret of the situation that faces one of our friendly banking competitors an institution which has done so much for the upbuilding of Miami should their trouble cause any uneasiness in the minds of the depositors of the City National Bank in Miami of which I am chairman of the board of directors you are hereby authorized to reaffirm in my name my previous published statement that I am squarely back of the City National Bank and I suggest that you impress on our depositors the fact that ample funds are available to meet any demands that may be made upon us—

"J. C. Penney."

In effect, the foregoing statements were unqualified representations to the bank's depositors that Penney was guaranteeing the safety of their money, and that they were to have the benefit of the experience and judgment that had made him the head of a chain of 1500 successful stores. As to each of these representations, Penney's default was utter and complete.

Following the aforesaid public announcements, the bank carried on a campaign to increase its deposits, and to a degree, the results were good. But, as subsequently will appear, a large portion of these deposits was straightway paid to Penney to reimburse him for money that he advanced to stop the run on City National Bank in Miami at the time of the failure of the Bank of Bay Biscayne.

At the time of argument I was told that when City National Bank in Miami closed its doors, Penney was financially unable to reopen them. As to his inability to do so, the record is silent, and I can, therefore, reach no conclusion upon the subject. But the excuse suggested, even if valid, falls short of being satisfactory. When he issued his statement, it was incumbent upon him to be positive that he could and would carry out his promises. The bank failed within a few months after he reassured the public as to its solvency, and so far as I know there was no occurrence of a cataclysmic nature in the meantime. But, assuming that his financial condition had become impaired, he was, in view of what he had said, under the sacred obligation to give close attention to the affairs of the bank, and this he did not do. Instead of giving it solicitude and attention as great as that which a mother exhibits in the presence of danger to her first born, Penney neglected and then deserted the child of his financial loins. Unqualified directors were permitted to continue to play ducks and drakes with the money of depositors.

So far as appears affirmatively, these men bore good reputations. Some had successfully engaged in business and a few had had some banking experience. One or more of them had large investments in the bank. But, though this is all true, the way in which they handled the bank's funds amounted to downright profligacy. This is particularly apparent in the Rand transactions whereby thousands of dollars were figuratively thrown into the waters of Biscayne Bay.

In giving consideration to the question as to whether Penney had subjected himself to liability under Section 93 of the National Bank Act, and Section 2 of the Federal Reserve Act, 12 U.S.C.A. § 501a, the Master concluded that, in order to hold him to account thereon, the proof should show that he had knowingly and intentionally participated in, or assented to, such violations of the Bank Act as are here alleged. Mere negligence, he thought, would be insufficient to charge him with violations which took place at directors meetings that he did not attend. In so holding, the Master placed reliance upon the decision in Yates v. Jones National Bank, 206 U.S. 158, 27 S.Ct. 638, 51 L.Ed. 1002. That ruling furnishes strong support for the Master's position. He concedes, however, that there is some scope for variation from the doctrine in Thomas v. Taylor, 224 U.S. 73, 82, 32 S.Ct. 403, 405, 56 L.Ed. 673, where, Mr. Justice McKenna said: "There is 'in effect' an intentional violation of a statute when one deliberately refuses to examine that which it is his duty to examine." That statement met with approval

in Jones National Bank v. Yates, 240 U.S. 541, 36 S.Ct. 429, 60 L.Ed. 788, and again in Corsicana National Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141.

The Master believed that these decisions were insufficient to hold Penney, and after citing First National Bank of Fairbanks v. Noyes, 9 Cir., 257 F. 593, and Atherton v. Anderson, 6 Cir., 86 F.2d 518, concluded that proof of Penney's knowledge of facts violative of the National Bank Act was a condition precedent to the fixation of liability upon him. Great as is my respect for the Master's point of view, I feel, for reasons already stated, constrained to differ from it. Penney's responsibility, under the circumstances here present, was quite as great as that to which a man was held in Thomas v. Taylor, supra. In that case, a bank director was held to liability for failing to make an examination to determine the true condition of an asset that had been characterized as doubtful by the Comptroller of the Currency, and which appeared on the bank's statement of condition, as having its face value. In Jones National Bank v. Yates, supra, where, notwithstanding information of the Comptroller which called attention to discrepancies in the published reports of a bank, and the directors failed properly to investigate the true situation, they were held liable under the statute. It would seem that their neglect was no more egregious than that of Penney. And, while the portion of the opinion of the Supreme Court in Corsicana National Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 84, 64 L.Ed. 141, indicating that if a director "deliberately refrains from investigating that which it was his duty to investigate, a resulting violation of the statutes must be regarded as 'in effect intentional,'" may have been obiter, it is doctrine that I consider sound and shall follow it. See also O'Connor, op.cit., page 283.

In this connection, notice may be taken of the recent opinion in the case of Federal Deposit Insurance Corporation, Receiver, v. Mason et al., 115 F.2d 548, decided by the Circuit Court of Appeals of the Third Circuit, upon November 13, 1940. In that litigation, the defendants-directors of a national bank were held to have knowingly violated the banking laws, because of having declared dividends of $120,000 at times when, had they made a proper audit of the books of the bank, they would have discovered that the dividends were being paid out of capital funds.

The law cannot condone willful and long continued neglect of a bank director to perform his duties. When violations of the banking statute are found to have been committed, and which his honesty, judgment and ability might have prevented, a director should not be permitted to exonerate himself from culpability upon the excuse that he had no actual notice of what was going on. Under the facts of this case, it was Penney's bounden duty to know what was going on. He saw numerous reports of the bank examiners, and these placed him upon notice of the need of his presence at the directors' meetings, and of the necessity of supervising the business affairs of the institution. If he was unwilling to perform his duties, he should have resigned.

With the foregoing principles of law in mind, I approach the items specified by plaintiffs, with respect to which it is said Penney should be held.

### Claim No. 1.

### City National Building, Inc.

Upon this claim, plaintiffs assert that the bank was damaged to the extent of $225,679.70. Between May 4, 1928, and the day of the bank's failure, it purchased 2,430 shares of the preferred stock of City National Building, Inc., and paid therefor the sum of $243,000. Plaintiffs and the Receiver concede that, upon this transaction, there was a recovery of $17,320.30, thus reducing the alleged loss to the amount now claimed. The following facts are involved:

City National Building, Inc., owned in fee a plot of land that fronted on both Flagler Street and Southeast 1st Street in Miami. A wooden building, three stories high, occupied the Flagler Street frontage, and a ten story office building faced on southeast 1st Street. The two structures were connected by an annex. The first floor, mezzanine and a portion of the basement were suitable for banking purposes and, during banking hours, the buildings were open from street to avenue, and persons approaching Flagler Street could readily reach the elevators of the office building.

Back in 1925, Miami Bank & Trust Company carried on business in the structure facing Flagler Street. Desiring better quarters, it was decided that a more modern

building should be erected. A company, bearing the name Miami Stockholders Company was organized and its stock distributed pro rata to stockholders of the Trust Company. Soon thereafter, Miami Stockholders Company bought the property on which the above described buildings now stand, and paid therefor the sum of $435,000, the money being obtained through a mortgage of that amount given to Miami Bank & Trust Company. On the day of its execution, viz., July 27, 1925, the Trust Company leased quarters in the new building to be erected upon the premises, for a term of ten years from January 1, 1926, at a rental of $36,000 per annum. The agreement contained a clause whereby the Trust Company, if it wished, might acquire additional space upon specified terms. This came about, and at the time City National Bank in Miami was organized, the rent was $53,000 per year. The new building was completed in May of 1926, at a cost of $626,590.79. In order to supply these funds, Miami Stockholders Company put out a serial bond issue of $650,000, bearing six per cent interest, and secured by a first mortgage upon the property. In this indenture, a nominee of Mississippi Valley Trust Company was named as trustee. The $435,000 purchase money mortgage was subordinated to that of $650,000, which covered not only the land and buildings, but also the rents and profits accrued and to accrue upon the lease to the Trust Company.

In June, 1926, City National Bank & Trust Company acquired the assets of Miami Bank & Trust Company, among them the $435,000 mortgage. The lease upon the banking quarters was also assigned to City National Bank & Trust Company. One of the conditions of the assignment was that the assignee should "assume and take over all obligations imposed on the lessee in * * * · the original lease to the same extent and as fully as though * * * named in the said original lease as lessee." The assignee further covenanted that it would "save and hold harmless the said assignor from any loss or damage accruing to it by virtue of any default on the part of The City National Bank & Trust Company in the performance of the covenants undertaken by the Lessee."

City National Bank & Trust Company entered upon the demised premises and began business on June 19, 1926. From that time on, and until the failure of City National Bank in Miami, rent of the premises was paid at the rate of $53,000 per annum. Following the formation of City National Bank in Miami, and upon March 22, 1928, that association became assignee of the mortgage for $435,000. Even then, and as early as October 10, 1927, the mortgage was in disrepute with the Comptroller, and he had directed that it be eliminated from the asset portfolio of City National Bank & Trust Company. With this fact, Penney was acquainted, having obtained the information in the Spring of 1928.

The office building was never profitable. It had been erected at boom time prices, and when Miami was overbuilt. The Master found that the total security behind the trust mortgage and the $435,000 second mortgage was not in excess of $400,000.

At this juncture, it is necessary to digress. In 1925, directors of Miami Bank & Trust Company, wishing to provide quarters that would be available to its employees, encouraged Miami Stockholders Company to acquire title to property known as the Prince Edward Apartments. To enable this to be done, the Bank, subject to a first mortgage of $60,000, advanced the sum of $120,250 upon the security of a second mortgage covering the premises. As matters then stood, Miami Stockholders Company was liable to City National Bank & Trust Company upon two second mortgages—one for $435,000, and the other for $120,250, or a total principal sum of $570,250, or more than ten percent of the bank's capital and surplus funds. This was violative of Title 12, Section 84, U.S.C.A. By reason of such breach of the statute, the Comptroller of the Currency insisted, and continued to insist, that these assets be removed from the portfolio of City National Bank and Trust Company. His insistence availed him nothing.

When City National Bank & Trust Company transferred some of its assets to City National Bank in Miami, and Penney and his associates came into control of the latter institution, they were immediately faced with the difficulties arising from the substantially worthless obligations of Miami Stockholders Company. The first mortgage upon the Prince Edward Apartments had been previously foreclosed, and the Bank made no effort to protect its second mortgage of $120,250. As a matter of fact, the holder of the first mortgage purchased the property at the foreclosure

sale for $55,787.68, and there was no equity left for the Bank. Interest on the mortgage for $650,000, covering the banking premises, had been in arrears for more than a year. The second mortgage too was in default, and, on March 23, 1928, the Bank started foreclosure of its mortgage for $435,000. Asserting that City National Bank and Trust Company of Miami had not acquired legal title to the assets of Miami Bank & Trust Company, Miami Stockholders Company threatened to defend against the foreclosure.

Here it should be remarked that at least two of the bank directors were also on the Board of Miami Stockholders Company and one of these was Saunders, a nominee of Penney. A lawyer named Weissbuch, who sometimes represented Penney, outlined to Saunders a means whereby the problem of the bank as respects the Miami Stockholders Company might be solved. Thereafter, at a meeting of the bank's Loan & Discount Committee, held March 31, 1928, Saunders proposed that a new company should acquire title to the bank building, and that 51 per cent of the new company should go to the bank and the remaining 49 per cent to Miami Stockholders Company. At the next meeting of the bank's board of directors, upon April 10, 1928, they were presented with a memorandum prepared by Weissbuch, in which it was stated that the plan Saunders had outlined, if executed, would enable the bank to "have complete control of the entire situation so that we can cancel the old lease immediately and prepare a new one." The day following Saunders instructed Weissbuch to prepare a contract to carry out the scheme.

Immediately, the bank brought the scheme to the attention of the Comptroller asking permission that it be executed. In so doing the bank stated: "The existing lease with Miami Stockholders Co. is to be cancelled and a new lease made with the Bank at a rental not to exceed $20,000. per year; thus creating a saving of about $33,-000. to the bank."

The Comptroller of the Currency, upon April 20, 1928, advised the bank that he would not oppose the plan. On the next day, the bank, in accepting the proposal of Miami Stockholders Company, stated that the outstanding lease would be cancelled.

A company, named City National Building, Inc., was incorporated, with 100 shares of common stock, and thirteen thousand preferred. The latter had a par value of $100 per share, and carried a cumulative dividend of six percent. On May 4, 1928, this company acquired title to the bank building, together with the lease of Miami Bank and Trust Company. The City National Bank in Miami and its nominee bank were given fifty-one shares of the common stock and the remaining forty-nine went to Miami Stockholders Company, and its nominee. The latter company also took 100 shares of the preferred stock to cover prepaid insurance and 1,380 shares were issued to the bank. They were treated as being payment of the principal indebtedness of $120,250 on the Prince Edward Apartment, plus accrued interest of $17,750, or a total of $138,000 of Miami Stockholders Company liabilities. In July, 1928, the bank acquired an additional block of the preferred stock of City National Building, Inc., and in return therefor, satisfied the second mortgage of $435,000, on the bank building, and in addition thereto wiped out an accumulation of $39,800, representing unpaid interest. So far as values were concerned, nothing had been exchanged for nothing, but a large book indebtedness had been eliminated.

The first mortgage was in serious default. Taxes, interest and amortization payments, amounting to $77,000, were unpaid and steps were required to remedy the situation. The unpaid obligations, together with the bonds outstanding upon the first mortgage, aggregated $647,000.

At a meeting of the Board of Directors of City National Bank in Miami, held May 8, 1928, and which was not attended by Penney, his agent, Saunders, reported the transactions just recited. He stated that additional preferred stock of City National Building, Inc., would be "issued to the bank as additional funds are advanced for amortization of the first mortgage or other expenses." This report was accepted and the bank officers were authorized to proceed with necessary payments on the first mortgage and accept preferred stock therefor, when and in amounts necessary. Thereafter, by payment of interest, and installments of principal, the bank, together with City National Building, Inc., kept the first mortgage in good standing. Payments on principal amounted to $150,000, interest accruals were $113,300.25, and tax remittances $40,475.03. A grand total of $303,775.25. Of this, City National Building, Inc., supplied $137,775.25, and the bank put up $166,000. For the advances the

bank received 1,660 additional shares of stock of the company, holding title to the bank building.

Along in early 1928, some alterations of the bank building were authorized. These, it was thought, would cost about $60,000. The actual outlay was something more than $72,000. Of this sum, $14,000 was furnished by City National Building, Inc., and the remainder of $58,000 was advanced by the bank. For this contribution, it received 580 additional shares of the preferred stock of City National Building, Inc. As a result of the alterations, some revenue was obtained from new tenants. At no time, however, was the income sufficient to pay the carrying charges of the premises.

Upon failure of the bank, its holdings of preferred stock of City National Building, Inc., amounted to 2430 shares, and for them, the bank had advanced as many hundreds of dollars.

Some time before the Comptroller was asked to approve the transactions just described, it appears that Miami Stockholders Company and City National Bank in Miami had come to the conclusion that the rental of $53,000 for the banking quarters was too high, and that in fairness, it should be reduced to $20,000. To carry out this thought, a new lease was prepared. And, when on April 13, 1928, the bank submitted to the Comptroller for approval, the arrangement whereby the indebtedness of Miami Stockholders Company had been extinguished, he was told that under the terms of the new lease, the bank would effect a saving of rent of $33,000 per year. Six days later, the Comptroller acquiesced in what had been done. In fact, however, as has been said, the rent was never reduced, and the bank continued to pay $53,000 per annum until its failure.

As respects the financial legerdemain just described, the plaintiffs and defendant receiver concede that in wiping out the debt of Miami Stockholders Company, in return for preferred stock of City National Building, Inc., the depositors suffered no loss. The mortgages were worthless when the bank acquired them and all that was done was to accept worthless stock certificates in their stead. There is, however, a contention that the sums advanced to keep the first mortgage on the bank building in good condition, in exchange for preferred stock certificates, are here recoverable, along with such rentals, in excess of $20,000, as were paid after the making of the tentative agreement that the rent be reduced to that sum. This contention, in all particulars, was rejected by the Master.

While criticizing the judgment of the bank directorate, whereby it was to expend $647,000 to acquire a building with a fair market value of but $400,000, and in which $435,000 had previously been lost, the Master felt that the situation concerning the lease offered, perhaps, some justification for the action taken. His thought was that the bank, having become tenant of the premises under the lease from Miami Stockholders Company to Miami Bank & Trust Company, and the lease having a maturity that reached seven and one-half years in the future, at an annual rent liability of $53,000 per annum, the action of the bank may not have been unwise. In other words, by what was undertaken, the bank, through its payment, would ultimately acquire not only title to the building, but also would protect itself against liability upon the lease.

He says: "There can be no question but that the consolidated bank was liable to pay $36,000, a year in accordance with the original lease of July 27, 1925 from Miami Stockholders Company to Miami Bank & Trust Company. The assumption of the covenant to pay rent by the assignee, the City National Bank & Trust Company of Miami, in form ran to the assignor Miami Bank & Trust Company, and not to the landlord Miami Stockholders Company, although Miami Stockholders Company simultaneously consented to the assignment. The landlord was, however, entitled to enforce the assignee's covenant of assumption * * * The rent was validly pledged to the first mortgagee. The first mortgage was in default and the first mortgagee was entitled to the rent from the date of such default if he took the appropriate steps to impound it. Failure to protect the second mortgage upon the foreclosure sale * * * would have resulted in the bank remaining liable to the purchaser at the foreclosure sale for the full amount of the rent for the balance of the term * * *."

The theory that City National Bank in Miami was legally bound to pay the rent reserved by the lease was first advanced by the Master. Until he suggested it, counsel for Penney made no such contention. While they now adopt it, their chief argument, in the way of justifying

the action of the directors in advancing money for the acquisition of the bank buildings, is that, by reason of the bank's ownership of the mortgage of $435,000, it really had an equity that was worthy of protection. Indeed, some fifteen printed pages are used to convince me that I should so hold. Nevertheless, both of these phases of the case have had careful consideration, and I am of the belief that there was no justification for what was done.

In the agreement, whereby City National Bank in Miami acquired certain assets of the City National Bank and Trust Company of Miami, there is nothing whatever that shows a formal assumption of liability upon the lease. Its history is this: As already seen, the instrument came into being on July 27, 1925, when Miami Stockholders Company, as landlord, delivered the same to Miami Bank & Trust Company. The tenancy of the latter was to begin on January 1, 1926, and run for 10 years at the annual rent of $36,000. Paragraph 6 of the indenture provided as follows: "The tenant covenants not to assign, transfer, sub-let or alien * * * this lease * * * without the consent of the landlord in writing first had and obtained."

On June 19, 1926, Miami Bank and Trust Company, having obtained the consent of Miami Stockholders Company, assigned the lease to the City National Bank and Trust Company of Miami, and in the assignment, the assignee agreed with its assignor—

"to strictly comply with the terms of said lease and will save and hold harmless the said assignor from any loss or damage accruing to it by virtue of any default on the part of said The City National Bank and Trust Company in the pursuance of the covenants undertaken by the lessee in said * * * lease.

"And the said The City National Bank and Trust Company does * * * further agree to assume and take over all obligations imposed upon the lessee in said original lease to the same extent * * * as though it was named in said original lease as the lessee."

The landlord in no. way released Miami Bank and Trust Company from any of the lease covenants that it had made.

Upon taking the assignment, the City National Bank and Trust Company entered upon the demised premises, using them as a banking house until the time when City National Bank in Miami—without the execution of any written or oral agreement of assumption—went into possession. The lease itself, meanwhile, had been assigned to the trustee named in the pool loan agreement of March, 1927, whereby The City National Bank and Trust Company had secured advances, amounting to $5,000,-000. For some reason, not clearly apparent, the lease seemed then to have been regarded as an asset. To this assignment, the landlord gave assent. When R. N. Denham became trustee under the pool loan agreement and First Trust and Savings Bank retired, the latter, with the consent of the landlord, assigned the lease to Denham.

Observation may thus be made that when, on February 7, 1928, City National Bank in Miami began to operate, it was without the slightest obligation under the terms of the lease, unless a contrary conclusion follows as a matter of law from the so-called agreement of consolidation between itself and The City National Bank and Trust Company. Occupancy .of the premises, in the absence of a true consolidation of the banks, was, it would seem, in the nature of a tenancy at will.

The question as to whether a true consolidation of the two banks was effected need not, I think, be decided, even though it has been labored by each of the litigants. For the purposes of this suit, I shall assume the fact. But any liability that rested upon City National Bank in Miami under the terms of the lease ran primarily to Miami Stockholders Company. True enough, that company had assigned the rents to the holder of the first mortgage of $650,000 covering the banking property, and the mortgage was in default for amortization payments, taxes and interest. Nevertheless, the first mortgagee had done nothing in the way of entering into possession, either by itself or by a receiver. Neither had it given notice of an intention to do so, as did the mortgagee, in the case of First National Bank of Chicago v. Gordon, 287 Ill.App. 83, 4 N.E.2d 504. The situation here was similar to that existing in the case of Haussmann v. Colonial Trust Company, decided by Judge Coxe, and reported in D.C., 23 F.Supp. 213. See also Dulberg v. Zankel, 67 F.2d 534, 535, where Judge Swan, writing for the Court of Appeals of this circuit, held that a mortgagee out

of possession is only a lienor without control of the mortgaged property or a claim to earnings thereof until he demands possession or has a receivership therefor extended for his benefit. As between the bank and the holder of the $650,000 mortgage, there was neither privity of estate nor privity of contract. There was, therefore, so far as I can see, no good reason why the bank and Miami Stockholders Company could not contract as between themselves in regard to their respective rights under the lease. No rights of the first mortgagee had, as yet, intervened. Miami Stockholders Company, it will be remembered, was indebted to City National Bank in Miami in the total principal sum of $555,250, together with a large accrual of unpaid interest. It was also liable upon the first mortgage of $650,-000. Being unable to pay any of these obligations, the bank, it would appear, was in a strong position to do almost anything it chose.

Even if the directors had good intentions in carrying out what was done, their failure to take note of real estate values is enough to condemn their acts. Made up largely of men interested in real estate, they seem to have been chiefly desirous of maintaining the inflated prices of boom times. As the Master points out, the estimates of the value of the bank property given by several of the directors when the plan was under discussion were unsupported by actualities in the community. He says:

"Discounting fully the information revealed to the trier of the facts by the unfolding of subsequent events, these opinions should have been assigned no importance. The land had been acquired for a mortgage of $435,000 at a time when land speculation was rife. The building had been put up for the other mortgage of $650,000. at a time when material and labor costs were skyrocketed as a result of boom times. The Miami Stockholders had contributed nothing to the enterprise. Their vociferousness, all out of proportion to their interest in the property, to retain a speculative interest in the building, should not have been treated by the directors as an important circumstance. Particularly is this so when *the most outspoken were officers and directors of the bank,* whose actions were, therefore subject to the more careful scrutiny. It is impossible that the directors could have believed that the building was now worth its cost. If they did, it was a belief negligently entertained.

"The evidence is convincing that an honest appraisal obtained at the time would have shown the building worth much less. The directors who were in business or who resided in Miami must have been aware of the diminution of economic exchanges and of the consequent depression in real estate values."

With these statements, I am in full accord. The extent of the decline in values that had occurred could have been quite accurately measured by the circumstances of business buildings in the immediate neighborhood. In 1925, the Halcyon Building had rented for $1,100,000 per year. The income in 1928 went down to $150,000. The Fort Dallas building, renting for $300,000 in 1925, yielded but $25,000 in 1928.

While I hold this transaction to have been speculative in its nature, and the bank's acquisition of stock of National Building Company as violative of Section 24 of the Act, there are other aspects to the situation that are, at least, open to other criticism.

The Comptroller of the Currency was not fully and frankly advised of all details of the plan. He was not told that the bank was embarking upon a course of conduct that would result in a further investment in the property of $243,000 in addition to what already had been lost.

As a matter of fact, the bank did start to foreclose the $435,000 mortgage upon March 23, 1928. Had the proceeding been continued, the bank could have accomplished at least three things—:

(1) Wiped out the interest of Miami Stockholders Company in both the building and the lease;

(2) Eliminated a security that the Comptroller had repeatedly criticised; and

(3) Have placed itself in a position, if it felt that there was an equity in the premises to acquire the same at its own price.

Preferring not to follow this procedure, heed was given to statements made by some holders of stock of Miami Stockholders Company, to the effect that City National Bank and Trust Company had not acquired legal title to the assets of Miami Bank and Trust Company. There was no apparent substance to the threats of litiga-

tion upon this score. At this point, it should be noted that two of these stockholders sat upon the directorate of the bank. But, for some reason, after negotiations, a settlement was reached through the execution of the plan proposed by Saunders in the Spring of 1928.

The foreclosure should have proceeded. Or, if not, then the indebtedness to the bank of Miami Stockholders Company, amounting to more than $555,000, should have been set off against such liability as the bank might have been under, pursuant to the terms of the lease. At the utmost, this was not more than $397,500. While Miami's indebtedness in the market was valueless, it was, for purposes of set-off, as between itself and the bank, worth one hundred cents on the dollar.

The failure of the bank to pursue one or the other of these courses appears to me to have been gross negligence. Had Penney properly discharged his duties as a director, he might have prevented what was done. He had been told that the rental of the premises was to be reduced to $20,000, but he stood by and permitted the bank to continue to throw good money after bad.

Execution of the scheme enabled the bank to set up the stock received in exchange for the indebtedness of Miami Stockholders Company as an asset, and to be carried as such in its balance sheet. Likewise, it successfully concealed the fact that, as a result of the worthlessness of the mortgages, the bank had suffered a loss of about $600,000.

Inasmuch as I have found this claim of the complainants to be well founded, both upon the basis of common law negligence and as being in violation of Section 24 of the Bank Act, it is unnecessary to inquire whether, as contended by defendant, Richardson Saunders, at the time of this transaction, was a lawfully qualified director of City National Bank in Miami.

The principal amount of recovery upon Claims 1 and 2 will be $313,683.70. This represents cash paid for preferred stock of City National Building, Inc., $243,000, plus excessive rental of $88,004, less salvage of $17,320.30, with interest upon $313,683.70, to be fixed by the Court.

Claim No. 3.
Coral Gables, Inc.
(Net Loss Claimed $139,092.62)

Here again, as respects this claim, I am not in accord with the conclusions of the Master.

In the first place, as the Master, in effect, found, Coral Gables Corporation, under the direction of George E. Merrick, a friend of Penney's, had been acting dishonestly. The Master specifically stated: "The corporation had frequently failed to account for the proceeds to the trustee under the series trust deed. There were some 3000 lots upon which purchasers had been given deeds without the mortgage having been released."

Of these facts the board of directors of City National Bank in Miami was, or should have been, aware. As of July 12, 1929, the bank was a creditor of Coral Gables Corporation, its affiliates, and of George E. Merrick, president of Coral Gables Corporation, to the extent of $404,801.-74. Against the paper of Coral Gables Corporation, the bank held collateral, consisting of $327,000, in principal amount of certain series bonds. Merrick's note, endorsed by Miami Ciro Corporation, was secured by lot purchase contracts of doubtful value. All in all, some 20% of the capital and surplus of the bank had already gone into an enterprise that had failed and which, under any circumstances, had a value that was entirely speculative. All the obligations held by the bank were in default.

When the directors of the bank first considered the Coral Gables situation, there was opposition to the suggestion that further aid be extended either to it, or to Merrick. Indeed, at the directors' meeting of February 14, 1928, approval was given to a demand to be made upon him and the endorser of his paper that— "unless said $51,-000. note then past due was paid prior to February 21, 1928, proceedings would be taken to foreclose and realize upon the collateral. Master's finding No. 107.

Penney stepped into the breach, but soon departed. Says the Master in Finding No. 108: "At the directors' meeting on March 22, 1928, defendant Penney advised the board against any action calculated to thwart the efforts then being made by Merrick and his associates to keep Coral Gables Corporation from receivership. He said Merrick had informed him that nothing was to be gained by an action against Merrick on his note for $51,000. Defendant Penney also told the board that Merrick wished the bank and the First Nation-

al Bank together to take $1,000,000. of a new bond issue contemplated by Coral Gables Corporation. When, however, Senator Hudson, one of the directors and of counsel for the bank, called Penney's attention to the fact that sufficient collateral had been collected to retire the $51,000, but that it had been dissipated by the corporation, and explained that a notice had been sent out for a sale of the collateral to the corporation's note, it was agreed that defendant Penney would examine the minutes of the loan and Discount meetings and that, unless after such examination a change of procedure should be agreed upon, the sale of the collateral would go forward. Defendant Penney made no such examination and took no further part in the Coral Gables transaction. The collateral was acquired by the bank by purchase at the sale on April 27, 1928 for $82,875. On May 4, 1928, after authorizing the employment of a Certified Public Accountant to analyze the collateral back of all bond issues of the Coral Gables Corporation in which the bank was interested, and after the receipt of such report, the activity of the officers of the bank was directed towards contacting other bondholders similarly situated. At a meeting of the Loan and Discount Committee held on May 23, 1928, the committee authorized a statement to the representatives of the Coral Gables Corporation that they would surrender the collateral held by the bank only upon payment of the full amount of Coral Gables obligations plus interest and costs to the date of such payment."

Penney was derelict in his duty carefully to scrutinize the entire Coral Gables situation, and what was done under it. He shortly went to Europe and "the board of the bank," says the Master—"gradually came to the conclusion that its best hope of salvaging and liquidating this large indebtedness lay in the reorganization of Coral Gables Corporation. The old management of Coral Gables Corporation had been ineffectually attempting a reorganization of its affairs since some time prior to 1928 without the cooperation of the bank. In the fall of that year a reorganization specialist and member of the New York Bar, one Carl L. V. Excelsen, who entered the picture originally as a representative of Manufacturers Trust Company of New York City, worked out a comprehensive plan for the reorganization of Coral Gables Corporation and its affiliates." Findings of the Special Master No. 109.

Thereafter, the Board of Directors, upon August 22, 1928, gave tentative approval to Excelsen's plan of reorganization. Penney was not present at the meeting. He should have been there. Upon this occasion, the board, and the Loan and Discount Committee, expressed disapproval of the proposed personnel of the new corporation that was to take over the properties. The objections were quickly obviated, and in this manner, Richardson Saunders, who was then vice-chairman of the bank's board of directors, became chairman of the board of the new corporation, and Denham its treasurer and chief executive officer at a salary of $25,000 per annum. On January 14, 1929, the Loan and Discount Committee authorized the officers of the bank to sign the reorganization agreement upon its amendment to conform to the views of the bank. The amendments being made, the document was signed the same day. Something more than a month thereafter the Loan and Discount Committee authorized the subscription by the bank to $200,000 in face value of Class A Bonds, to be paid for, $150,000 in cash and $50,000 in debenture stock. This action was approved by the board upon April 23, 1929. Penney was again absent. The reorganization immediately was put into effect. Very shortly thereafter, substantially all of the bank's money was lost and the bad judgment of the board completely established.

The Master believed that the board acted in entire good faith and that, under all circumstances, its action was justified in order that the bank's investments in Coral Gables might be salvaged. The Master also thought that since the transaction was of this nature, it did not constitute a violation of Section 24 of the National Bank Act.

With this latter conclusion I cannot agree. The securities received by the bank in exchange for its money, in no way approached the quality and standard established by the statute, and I do not see my way clear, notwithstanding Atherton v. Anderson, 6 Cir., 86 F.2d 518, to put approval upon their acquisition.

In addition to the foregoing bases of Penney's liability, there is another, viz., the presence at the meeting of April 23, 1929, of four directors who were not qualified to be there, none of them owning the requisite shares to authorize him to deal with the bank's money. For reasons previously stated, this must also be regarded

as a violation of Section 72 of the Act. Complainants and Receiver may recover the loss claimed.

### Claim No. 4.
### Fred H. Rand, Jr.
### (Net Loss Claimed $104,459.59)

As respects this claim, the Master found Penney himself, along with other members of the Board, to have been negligent in the performance of his duties. This was undoubtedly true. But, later on, in his opinion, the Master exonerated Penney from liability upon the theory that the Statute of Limitations barred recovery from him. This matter had attention in my oral opinion of February 5, 1941, and I adhere to the ruling there made, viz., that the statute had not run. Fleishhacker v. Blum, 9 Cir., 109 F.2d 543.

As to the sum to be recovered under this claim, I shall adopt the sum which the Master thought to be the extent of the loss. I may add that some of the Rand transactions were violative of Sections 24 and 84 of the National Bank Act. Here again, unqualified persons functioned as directors and for such reason there was also a violation of Section 72.

### Claim No. 5.
### (Excess Borrowing)

Damage claimed:
 Principal $1,050,500.87.
 Interest $141,246.45.

Here too, in part, I must dissent from the Master's conclusion.

The excessive loans here in question were, I believe, in violation of Section 84 of the National Bank Act. I also think the loss which came to the Bank in connection therewith, viz., interest in the sum of $141,246.45, is properly chargeable to Penney under Section 93 of the statute. He, undoubtedly, was fully aware of the bank's policy in borrowing money, and gave tacit, if not express, assent thereto. His contention that in order to be liable, he must have officially assented to the borrowings, makes no appeal to my judgment, and it is rejected.

As to the principal of the loans remaining unpaid at the time of the bank's failure, I think the Master's decision is correct.

So long as the money was utilized in paying off other indebtedness of the bank, and some of it certainly was, the depositors were not prejudiced. If the money, in part, went into City National Bank Building and the Rand and other improper advances, the answer is that complainants are recovering those disbursements, and even if there were a violation of the statute, the depositors cannot twice recover for the wrong done them. They should, however, have the interest that was expended upon account of the excessive borrowings.

Complainants now advance the theory that Penney is liable for the principal of the borrowings upon the ground that there was no real consolidation of City National Bank and Trust Company of Miami and the City National Bank in Miami. The case was not begun upon this theory. Penney's bank acquired the securities in the pool loan and, in doing so, took them subject to the lien of the pledge by which they were hypothecated.

Slight though the worth of these securities may have been, the depositors had the benefit of whatever value there was in them. The thought of all concerned, including the Comptroller, was that City National Bank in Miami was obligated to pay off the pool loan, and, at this time, I shall not go behind the Comptroller's certificate that the two banks were properly consolidated.

### Claims No. 6 and 7.
### (Losses upon Loans Made During Reserve Deficiency)

Net loss claimed $28,545.65.
Penalties $5,178.21.

As to this claim, my difference with the Master is that, although Penney is not shown to have known personally of the reserve deficiencies, he should, upon the whole case, be held to be chargeable with such notice. Consequently, if by reason of this, liability rests upon him, it should be so declared. So far as the bank suffered losses as a result of loans made during the periods when there were deficiencies at the Federal Reserve Bank, I shall hold Penney to responsibility. The express command of the statute is that during a time of reserve deficiency— "* * * No bank shall at any time make new loans or shall pay any dividends unless and until the total balance required by law is fully restored." 12 U.S.C.A. § 464.

This provision of law should be construed to mean precisely what it says. Its purpose is to require a bank that is deficient in reserves to restore the same as quickly as possible. Restoration will be neither expeditious nor certain if a bank be per-

628

mitted to pay dividends and make interim loans. Furthermore, if the statute can be violated with impunity, and without personal liability to the directors who give assent thereto, enactment of the measure was an idle gesture. Losses resulting from loans made during the time that there was a deficiency in reserves are recoverable. A diligent director would have known of the deficiency and acted accordingly.

■ The law does contemplate that a bank's reserve may fall below the minimum that should at all times be on deposit. For such shortages as occur, a regulation of the Federal Reserve System provides its own penalties, and these in this case were paid. Penney should not be compelled to restore them. They were a part of the operating cost of the bank, and, in the absence of more proof than is here, as to which overdrafts were justifiable and which were not, I shall hold for defendant.

### Claims 8 and 9.
#### Tarrier Company of Delaware.

Loss claimed, cash $48,295.64; obligation of First National Bank of Miami valued at $62,500.

■ Once more, I feel that the Master reached an erroneous conclusion.

Penney must be held to have been acquainted with the full details of the Tarrier transaction. He not only contributed, through Penney-Gwinn, to the relief which Tarrier Corporation was furnishing the bank, but Richardson Saunders, his agent and general factotum, was trustee under the arrangement that was carried into effect. For the aid it rendered, Tarrier was to get in exchange worthless and questionable assets of a face value of $2,000,000.

Such was the statement made at the stockholders' meeting, and such was the representation made to the Comptroller to induce him to approve the transaction. These statements were supplemented, upon April 1, 1930, by Penney's public declaration that: "* * * we have as of March 31, 1930, put into the bank another One Million Dollars of new money * * * charging off Two Million Dollars of bad and questionable assets."

This being his understanding of the matter, he should have been alert to see that the understanding was carried into effect.

What actually happened was that Tarrier Corporation was the recipient, along with "bad and questionable assets," of two items that were good and substantial. Upon one of them there was a realization of $48,295.64, and of $62,500, on the other. By way of explanation for turning over these assets to Tarrier, Saunders told Roberts, Comptroller of the Bank, that Penney-Gwinn, having been required to put up more money than had been anticipated, "simply had to have a little sweetening along with it." Penney must return the amounts above mentioned, with interest to be fixed by the Court.

### Claims Nos. 10, 11 and 12.

No. 10. L. D. Llewellyn, Inc. (net loss claimed $8,709.14).

No. 11. Central Miami Corporation (net loss claimed $4,402.38).

No. 12. J. E. Rose & Company (net loss claimed $2,294.91).

■ Without setting forth the details of the facts having to do with these relatively small claims, all that need be said is that each of them has been carefully examined, and in my belief, each of them is well founded. They are attributable to Penney's negligence, and to the fact that in some, if not all of them, the action of the directors was vitiated by the presence at their meetings of a number of Penney's disqualified dummies.

### Claims 13, 14 and 15.

No. 13. Salvor Holding Company, Inc. (loss claimed $80,558.39).

No. 14. Druid Court Apartments—Warehouse lot exchange (loss claimed $17,969.93).

No. 15. Nathan Schreiber—Samuel Goldberg (loss claimed $1,409.85).

■ Upon items 13 and 14, I shall adopt the findings and conclusions of the Master. This, too, I shall do with respect to item 15. The latter amounts to but $1,409.85, and while I have some doubt as to the propriety of dismissing it, I think that Penney, upon the whole, should not be held to have been obligated to give close attention to such a small transaction.

### Claim 16.
#### Norton Apartments—South Miami Lot.
#### (Loss Claimed $10,693.12)

■ As to this item, liability will be imposed upon Penney. He negligently failed to give proper attention to what was here done.

## Claims 17 and 18.

No. 17. Raga and Albert Maloly (loss claimed $2,446.95).

No. 18. Elizabeth Gunderlock (loss claimed $3,058.27).

Upon these items, I shall adopt the findings and conclusions of the Master, which exonerate Penney.

## Claim No. 19

### Preference of J. C. Penney and J. C. Penney-Gwinn Corporation.

#### (Alleged Preference $880,000.)

The Master gave close attention to this subject matter, delivering a lengthy and separate opinion concerning it.

Without restating all the facts there set forth, in substance, they are these:

The following payments are said to have been made at a time of the bank's "insolvency, or in contemplation thereof" (12 U.S.C.A. § 91):

To Penney-Gwinn, June 23, 1930, $100,000.

To Penney-Gwinn, July 7, 1930, $680,000.

To J. C. Penney, July 7, 1930, $100,000.

When the Tarrier transaction was consummated, it should, at the expense of repetition, be stated that Penney-Gwinn's contribution to the corporation had been $403,981.25, and that of C. M. Keyes $159,082.50. In return for these sums, their contributors received preferred stock. The balance of the money needed by Tarrier was raised through its issuance of a note secured by collateral supplied by Penney-Gwinn. The common stock of Tarrier went to City National Bank in Miami. If the assets which went to Tarrier yielded a sum more than sufficient to pay off its preferred stock, the excess would have gone to the bank.

Due to what was supposed to be the bank's improved financial condition, as a result of the Tarrier deal, and the reduction in the bank's capital and surplus, the Federal Reserve Bank of Atlanta again permitted City National Bank in Miami to rediscount its paper to a maximum of $300,000 upon the deposit of collateral of $150,000.

Gordon, president of the Penney bank, finding conditions quite different from those he had expected upon acceptance of his position, made an examination of the bank's assets. This he did at Penney's direction. "Penney says that he asked Gordon to prepare a statement 'giving me the worst possible picture that he (Gordon) could paint.'"

At the hearing Gordon testified that, while the Tarrier transaction had brought about an improvement, he "realized that the bank had a very large amount of assets that were of a decidedly questionable character, slow, non-income producing and far from being desirable from the standpoint of a going bank."

On a visit to New York, in April, 1930, he saw Penney and told him that "There were still in the bank assets non-income producing; that due to that fact and due to certain fixed charges he felt that the outgo would be more than the income."

In preparing his statement, Gordon told the persons who assisted him "to put it in the very worst light possible that was justified by the facts as they found them * * *" Gordon wished, he said, to err on that side rather than to report a situation a little bit rosier than it possibly was. When the statement was completed, it was forwarded to Penney under date of May 23, 1930. Accompanying it was a letter from Gordon reading, in part, as follows: "In making this appraisal, we have endeavored to be ultra conservative. If, in so doing, we have predicted losses which subsequently do not accrue, we will have erred on the safe side. We * * * have considered every item from the standpoint of its value today. There, of course, is a probability that our judgment may be wrong both ways. We may have underestimated as well as overestimated our probable losses and of course only the actual liquidation of the several items involved will establish the truth or falsity of our estimate. We are simply trying to give you and Mr. Gwinn our opinion based on a detailed study of these items."

Three days later, Gordon wrote to Gwinn and said:

"* * * I know that you and Mr. Penney want to know the facts, and in an effort to give you this information, we have no doubt painted a picture which is unnecessarily dark and one which with improved conditions generally will assume a much more favorable light. It is, of course, needless for me to say to you that information of this character must be regarded by all of us in the most perfect confidence. Should this appraisal come to the eyes of the National Bank Examiner, he would very probably force us to charge out a great deal of paper which I think we can induce

him to allow us to carry for a long period. This appraisal is for our own eyes and does not reflect the attitude that we would take in appraising this paper with the Examiner, because in the first place the losses which we have appraised in this statement are by no means certain and we have purposely put the situation in the worst light that is possible, since I feel that you and Mr. Penney want just this type of appraisal.

"I sincerely trust that the appraisal that we have prepared is incorrect and that time will demonstrate the fact that we have been unnecessarily conservative in the figures that we have established."

At about this time, the Bank of Bay Biscayne was approaching its end, and realization was had that should it topple and fall, there would be a run upon City National Bank in Miami.

The Tarrier Company note for something like $436,000, which had been secured by collateral belonging to Penney-Gwinn, was now held by First National Bank of Atlanta. Its security was such that, in the event of need, the sum of $500,000 could immediately be placed at the disposal of City National Bank in Miami. Penney-Gwinn also was prepared to deposit funds in the bank, the same to be treated as loans. When these deposits were made, it was "upon a definite understanding that they were to be withdrawn as soon as the crisis had passed." It was also agreed that, if necessary, Penney would send a telegram to the effect "that ample funds are available to meet any demands that may be made upon us."

The expected failure of Bank of Bay Biscayne came upon June 11, 1930. A run on City National Bank in Miami followed. In order that the Penney bank might be in a position to meet all demands of depositors, the First National Bank of Atlanta sent $500,000 to Federal Reserve Bank in Atlanta; Penney-Gwinn supplied $250,000 more and Penney another $100,000. From these credits, a branch of the Federal Reserve Bank in Jacksonville sent a half million dollars to City National Bank in Miami.

Before the funds arrived, the bank had paid out all cash on hand, but the depositors being informed that money was en route by airplane, were content to await its arrival. The funds reached Miami about four o'clock and such depositors as wished their money were paid.

The next morning, Penney-Gwinn supplied the bank with another $150,000, but the run having subsided, it was not needed.

A campaign to increase the bank's deposits was begun immediately among depositors of the Bank of Bay Biscayne and other persons. Gordon spoke over the radio, assuring the Miami public as to the strength of the city's banks, and appealed for their support. An armored car was sent to a nearby community, that was without banking facilities, to receive deposits. And Penney-Gwin, assisted by persons in City National Bank in Miami, acquired substantial stock interests in Miami Beach Bank and Trust Company, then in process of formation, to take over trusts that formerly had been committed to the care of Bank of Bay Biscayne. Gordon, outwardly at least, acting as though he was without worry, departed upon vacation.

As has heretofore been seen, the Penney bank had long been in the habit of obtaining cash advances from its principal stockholders. These were carried as deposits and their purpose was to meet emergencies and temporary needs. The money, when no longer required, would be returned.

On June 10, 1929, Penney-Gwinn had borrowed $110,000 and deposited the same in the bank, thus increasing its balance to $125,883.32. The money had been borrowed for a month and on July 5, 1929, Gwinn wired the bank asking them to withdraw $110,000 by July 10th. Buss, Vice-President of City National Bank in Miami, wrote Gwinn saying that the bank might be able to comply with the request, but added that, since a bank in Jacksonville had closed, it might have an adverse effect upon other Florida banks, and that he would again communicate with Gwinn by telegraph. On July 10, 1929, Davis sent Gwinn a message which read: "Not possible to remit one hundred ten thousand today. Am writing." Davis' letter stated that the payment if made "would leave our cash much too low and would cause comment among our own employees."

On July 16, 1929, Gwinn wrote the bank, saying: "I trust you can work the $110,000 out at the earliest possible moment."

No further demand was made and two days later Penney-Gwinn made a special deposit of $500,000.

On June 18, 1930, in response to Penney-Gwinn's expressed desire to withdraw $100,000, Saunders sent a telegram to the

Treasurer of the company which read: "We are prepared meet your draft one hundred thousand but lay off us for any further funds until after next Comptroller's call about July first"

From this correspondence, it will be seen that for about a year, Penney-Gwinn knew of the difficulties of the bank in responding to its requests for withdrawals.

A few days after Penney-Gwinn had withdrawn the above mentioned $100,000, and upon June 28, 1930, and in order unquestionably to enable the bank to appear to better advantage, in response to the Comptroller's call for a report upon July 1, 1930, Penney-Gwinn made a deposit of $380,000. On July 7, 1930, withdrawals by Penney and by Penney-Gwinn amounted to $780,000, the balance of the money that had been advanced to meet the emergency occasioned by the failure of the Bank of Bay Biscayne. The sum then remaining to the credit of Penney-Gwinn was precisely the same that it had been prior to June 11, 1930.

Complainants and Receiver here allege that the repayment of the loans of $880,000 were preferential in character, and are here recoverable from Penney.

During the hearings, complainants and Receiver offered to prove the value of 113 parcels of real property held by the bank, as of June 23 and July 7, 1930. The purpose was that such proof, taken in connection with other evidence, would establish the bank's insolvency. The Master estimated that proof and counter-proof bearing upon the value of these assets would require ten months for presentation, and that the cost would be great. Being told that, aside from the real estate values, all evidence having to do with the question of insolvency was then in the record, the Master declined to take expert testimony as to the value of the real estate parcels. In addition to the reasons already set forth, he thought that such testimony would be none too helpful.

As matters stand, therefore, the question of solvency or the contemplation thereof must be decided upon the record as it now is constituted.

The statute bearing upon the insolvency of a national bank is this: " * * * and all payments of money to either [stockholders or creditors], made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its [bank's] assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void * * *." U.S.C.A. Title 12, Section 91.

Reverting to the appraisal of the bank's assets as made by Gordon and his associates, it is to be noted that the losses estimated upon the basis of a sale of such assets at public auction would be $1,032,493.97. Excluding capital stoc'., there was an excess of liabilities over assets of $32,493.97. Upon the appraisal certain marginal notes appeared. In these Gordon expressed doubt as to the soundness of the values at which certain assets were carried.

Gordon's valuation of the preferred stock of City National Building, Inc., representing the bank's interest in the premises wherein it conducted business, was $590,000. On the books of the bank the stock was noted as being worth its face value, viz., $733,800. As to his own appraisal of this stock, Gordon said: "I question the correctness of the above appraisal, feeling that it is too high."

Upon the value of the building, as fixed by the Master, the stock was utterly worthless.

Referring to the "A" bonds of Coral Gables, Gordon said: "In view * * * that there is now pending a tax liability of approximately a half million dollars, and in view of the whole general situation in connection with this Coral Gables corporation, we are very much worried about our position in this situation, * * * We have not entered them as a loss but we feel that this appraisal of the "A" bonds as good is subject to criticism, and may ultimately be shown to be incorrect, thereby showing a further loss in our securities of $200,000."

The loss on this commitment turned out to be $139,092.62, showing that Gordon's fears in the matter were extremely well founded. Moreover, the appraisal did not exclude the item of the "building alterations," listed on the books as being worth $72,116.54. They were without value. Furniture and fixtures, upon which an actual loss of about $50,000 had been sustained, were carried at $177,696.73.

Had the values given the above mentioned items been excluded from the appraisal, the bank would have been shown to be completely insolvent. When Penney-

Gwinn received Gordon's appraisal, it was put in the files of the company, and neither Penney nor Gwinn, prior to July 7, 1930, took steps to investigate its accuracy. Penney wrote Gordon that, in the course of a trip through the southwest, he perused the appraisal and its accompanying data, and expressed appreciation that the same had been made up with such careful detail.

After completing the appraisal, Gordon collected the working papers from the persons who had assisted him in the task, and placed them in his safe deposit box and they were treated as confidential documents. Of all the depositors, only Penney and Penney-Gwinn knew of their disclosures.

The bank, upon June 23, 1930, had previously pledged county and municipal bonds, carried at $539,030.55, including principal and interest, together with $1,080,254.23, principal and interest of Government bonds, for the purpose of being permitted to carry deposits of public money. As of July 7, 1930, all the bank's investments in municipal bonds were in pledge, and this was true as to $1,135,728.96 out of a total of $1,221,585.47 of government bonds.

In the light of the foregoing considerations, Gordon's appraisal was far from being the conservative document he had described it to be in his letters to Penney and to Gwinn.

 During his testimony Gordon stated that the appraisal was kept in his locker, because he realized that "the whole thing was loaded with dynamite." The Master first ruled this statement to be competent and relevant, but later reversed himself, and struck the same from the record. I think the Master should have adhered to his first ruling. The statement was explanatory of Gordon's own action; it tended somewhat to contradict his letters, and showed the state of his mind when he permitted the withdrawal of $880,000.

Examined further, Gordon proceeded to say:

"My justification for running a bank in the face of an investigation which disclosed this situation to me was that irrespective of what probable losses were apparent, that those losses were more than offset by Mr. J. C. Penney and J. C. Penney-Gwinn Company's assurance to me that they would provide whatever money was necessary to take care of any losses, and I was en-

trenched in that position by Mr. Penney having come right up with the money, a million dollars of it, the first time I called on him in connection with the Tarrier deal; in other words, my position and my action was this: I realized that the bank was in a pretty bad shape, but I had the assurance of a man that I believed to be worth from fifty to sixty million dollars, that he would provide whatever money was necessary to clean this bank up and protect the depositors absolutely; so irrespective of whatever losses we might have anticipated at the time this report was made, there was an intangible, but very definite, asset that did not appear in the statement in the nature of Mr. Penney's personal promise to me and his published statement which, by the way was, as I stated yesterday, written by me with the very definite purpose of asking him at that time to reaffirm publicly what he had stated to me privately, and he did it.

"Q. Am I correct in assuming that you continued the operation of this bank in reliance upon that promise after this appraisal of May 23rd? A. Yes, absolutely.

"Q. That is the promise of Mr. Penney? A. That is right; and I want to say at this time, as I stated yesterday, that I want to be perfectly just to Mr. Penney in this thing. That old man came right up to the 'Lick Log' right from the very scratch up to the 20th day of December."

My interpretation of this testimony is that, unless Penney responded to such further calls that might be made upon him, the bank, upon its own assets, could not continue in business. Instead of closing the bank, it was left open in the vain hope and expectation that Penney, under no legal obligation so to do, would continue to be ready, able and willing to advance money as and when he should be so requested.

The bank's sole recourse for borrowing purposes, or other aid, was to Penney-Gwinn and Penney. Without collateral, and none was available, it could borrow nowhere else. Its reserve with the Federal Reserve bank was under water, and without continued help from its sponsors, the bank was doomed.

This record is open to the fair inference that as between the last of June, 1930, and the day of final closing, the bank's condition underwent no substantial change. What, during that period, must have been the state of mind of Penney and Gwinn?

Gordon's ideas on the subject are crystal clear.

As far back as June 19, 1929, Gwinn knew that the bank did not meet the demand his company had made upon it. Both he and Penney knew that, for a number of hours, the bank had defaulted in its payments at the time Bank of Bay Biscayne failed. It was then that Penney sent his telegram to allay the fears of the people of Miami, saying: "Impress on our depositors the fact that ample funds are available to meet any demands that may be made upon us."

The funds furnished did not belong to the bank—they consisted of borrowed money. As Penney knew, the bank had no unpledged assets upon which money could be raised. He had seen—on the face of Gordon's appraisal—that the bank was insolvent. He knew, or should have known, that Gordon had overvalued the banking house, and the Coral Gables bonds; that the "building alterations" were not an asset; and that the banking fixtures should have been depreciated by more than $50,000. He knew, too, or should have known, that if any emergency arose, the salvation of the bank depended solely and alone upon his willingness and ability to advance further money. Penney knew also that his own willingness and ability to supply money were nothing more than moral obligations, and wholly unenforcible. He knew that if and when he failed to furnish the bank with funds, it, too, would fail. He knew also that, being mortal, he might die. And yet, after he had given the public his assurance of readiness to continue to support the bank, and the depositors, in reliance thereon, had refilled the coffers of his bank, he and Penney-Gwinn withdrew their loans. And whence came the money? In part, at least, from the confiding customers whose trust had been won by the word of a man upon whom they thought they might safely rely. The money came not from assets of the bank, but from liabilities it had assumed to the depositors.

The purpose of the prohibitions of Section 91 of the National Bank Act, said Mr. Justice Brandeis, in Mechanics Universal Joint Company v. Culhane, 299 U.S. 51, 57 S.Ct. 81, 83, 81 L.Ed. 33, "is not directed solely to managing officers. The duty not so to defeat the just and equal distribution of the assets commanded by the act rests upon all who obtain such knowledge by reason of their connection with the bank—upon directors and employees as well as upon the executive officers."

In the light of all the proof, I am persuaded that, considering the realities of the business world, both Penney and Penney-Gwinn must be held to have received the payments in question, in their own contemplation, and in that of Gordon and the bank's directorate, of the insolvency of City National Bank in Miami. Faith, hope and charity—standing alone—are too intangible for reasonably prudent men to place firm and honest trust upon them. If they do so, and disaster comes, they should be held to have contemplated the natural and probable results of their acts.

Penney would, nevertheless, appear to be entitled to an offset upon this claim. After the last withdrawal of funds upon July 7, 1930, Penney-Gwinn account stood at $171,602.13. When the bank collapsed, it had gone up to $485,500.87, an increase of $313,898.24. This increase, equitably, I think, should be regarded as a restoration of a portion of the preferences. Other depositors, as well as Penney, have shared in its benefits, and Penney should not again be required to make restoration of the amount by which the account was augmented.

The question as to when interest upon the losses sustained by the bank should begin to run remains for decision. Counsel for Penney argue that it should be calculated from the date of the decree to be entered herein, citing, among other authorities, Bates v. Dresser, 251 U.S. 524, 40 S. Ct. 247, 64 L.Ed. 388, and the second opinion of Judge Tuttle, in the case of Anderson v. Akers, D.C., 11 F.Supp. 9. These cases have been examined, but, in my judgment, upon the facts of this case, they are outweighed by the holding of the Supreme Court in Corsicana National Bank v. Johnson, 251 U.S. 68, 40 S.Ct. 82, 64 L.Ed. 141, and in Bowerman v. Hamner, 250 U.S. 504, 39 S.Ct. 549, 63 L.Ed. 1113. It follows that, heavy as is the interest penalty to be imposed upon Penney, I am left without an alternative course of action. Interest will be calculated from the dates upon which the respective losses were sustained.

Findings of fact and conclusions of law, in accordance with the foregoing opinion, may be submitted.

Exceptions to the Master's findings and conclusions, which are contrary to the

634

views I have expressed, are sustained. Exceptions to the Master's findings that are in accord with my own are overruled.